UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
PETER LEACH and DOMINICA LEACH,

                Plaintiffs,                      **OPINION & ORDER**

      -against-                        No. 17-CV-5363 (CS)

CITY OF NEWBURGH, DANIEL CAMERON,
MICHAEL CIARAVINO, RICHARD CARRION,
and FRANK LABRADA,
                        Defendants.
-----------------------------------------------------------------x

Appearances:

JenniElena Rubino, Esq.
Rubino Law Firm, P.C.
Yonkers, New York
*Counsel for Plaintiffs*

Richard K. Zuckerman, Esq.
Matthew J. Mehnert, Esq.
Lamb & Barnosky, LLP
Melville, New York
*Counsel for Defendants*

Seibel, J.

      Before the Court is the motion to dismiss of the City of Newburgh, Daniel Cameron,

Michael Ciaravino, Richard Carrion, and Frank Labrada (collectively "Defendants").  (Doc. 33.)

For the following reasons, Defendants' motion to dismiss is GRANTED.

## I.      **BACKGROUND**

      I accept as true the facts, but not the conclusions, set forth in Plaintiffs' Amended

Complaint.  (Doc. 23 ("AC").).

### A. Facts

#### 1. Plaintiff Peter Leach's Employment History

Plaintiffs Peter and Dominica Leach are a married couple residing in New Paltz, New York. (*Id.* ¶¶ 4-5; *see id.* ¶ 77.) Peter Leach ("Lt. Leach") was hired as a police officer by Defendant City of Newburgh (the "City") in 1990, was promoted to sergeant in 2002, and was promoted to lieutenant in 2006. (*Id.* ¶ 11.) While employed by the Newburgh Police Department ("NPD"), Lt. Leach also owned a tree service business. (*Id.* ¶ 13.)

In May 2014, Lt. Leach was the only lieutenant in the NPD eligible for an in-house promotion to police chief according to qualification standards promulgated by the City Civil Service Commission (the "CSC"). (*Id.* ¶¶ 9, 12.) To qualify for the position of police chief, one must take either an internal promotion examination, which is available to qualified applicants employed by the NPD, or an open competitive examination, which is open to any qualified applicant. (*Id.* ¶ 9.) To be eligible to sit for the internal promotional examination, an applicant must have two years of supervisory experience as an NPD deputy police chief or five years of supervisory experience as an NPD lieutenant. (*Id.* ¶ 10.)

On May 29, 2014, Lt. Leach was involved in a car accident while on duty. (*Id.* ¶ 14.) He sustained serious and permanent injuries to his neck, back, and shoulder and was treated at St. Luke's/Cornwall Hospital by Dr. Jill Jackson. (*Id.* ¶¶ 15-16.) Dr. Jackson recommended that he see an orthopedist, (*id.* ¶ 15), and on June 2, 2014, Lt. Leach met with Dr. Jean Bachar, who deemed Lt. Leach "totally disabled" and unable to perform his police duties, (*id.* ¶ 17.) Lt. Leach applied and was approved for benefits provided to police officers injured in the line of duty pursuant to General Municipal Law § 207-c. (*Id.* ¶ 18.) Between June 10 and August 7,

2014, Lt. Leach had multiple doctor's appointments and MRIs; each visit revealed problems with his spine or right shoulder. (*Id.* ¶¶ 20-24.)

On October 1, 2014, Lt. Leach attended an independent medical examination ("IME"), during which he was examined by Dr. Charles M. Totero, an orthopedic physician employed by the City. (*Id.* ¶ 25.) Lt. Leach informed Dr. Totero of his desire to return to work and Dr. Totero recommended that he return to work in a light/restricted duty capacity. (*Id.* ¶ 26.) Following the IME, Police Chief Michael Ferrara ordered Lt. Leach back to work. (*Id.* ¶ 27.) On his second day back, Ferrara advised that he was putting Lt. Leach back on § 207-c benefits and told him to go home because he was noticeably physically unfit for duty. (*Id.* ¶ 28.) Lt. Leach repeatedly asked to return to work, but each request was denied. (*Id.* ¶ 29.) He asked Ferrara how to proceed with his situation, and after discussion with City Attorney Michelle Kelson, Ferrara advised Lt. Leach to apply for Accidental Disability Retirement, which Lt. Leach did immediately. (*Id.* ¶ 30.)

On January 10, 2015, Ferrara retired after experiencing verbal pressure to do so from Defendant Michael Ciaravino, the City Manager. (*Id.* ¶¶ 31-32.) That same day, Ciaravino, pursuant to his appointing authority under New York State Civil Service Law, appointed Defendant Dan Cameron as Acting Police Chief. (*Id.* ¶ 33.) Prior to his appointment, Cameron had been an NPD lieutenant, but he did not have at least five years of supervisory experience as a lieutenant or two years of experience as a deputy chief, as is required to sit for the internal promotional exam for police chief. (*Id.* ¶ 34; *see id.* ¶ 10.)

2. The Light-Duty Hearing

On February 27, 2015, Lt. Leach attended another IME, this time with Dr. Harvey Seigel. (*Id.* ¶ 35; *see id.* Ex. A at 1.) Dr. Seigel stated in his report that although Lt. Leach was not

capable of returning to full duty, he was fit for light duty. (AC ¶ 35; *see id.* Ex. A at 14.) Dr.

Seigel also recommended that Lt. Leach continue physical therapy on his back, neck, and right

shoulder. (AC ¶ 35; *see id.* Ex. A at 15.) On March 13, 2015, Cameron sent a letter to Lt. Leach

ordering him back to work. (AC ¶ 36.) Lt. Leach's union-provided counsel advised that he

request a light-duty hearing to determine if he was fit for his job duties. (*Id.* ¶ 37.) On July 23,

2015, a light-duty hearing was held at which Dr. Seigel testified that Lt. Leach was only partially

disabled and was fit for light duty only. (*Id.* ¶ 39.) Representatives from Lt. Leach's union, the

Police Superior Officers Association ("PSOA"), were aware of the hearing and failed to appear.

(*Id.* ¶ 40.) Following Dr. Seigel's testimony, the hearing was adjourned until August 12, 2015.

(*Id.* ¶ 39.)

   At the August 12, 2015 hearing, Lt. Leach's treating orthopedist Dr. Bachar testified to

the treatment she had been administering to Lt. Leach since his May 2014 accident. (*Id.* ¶ 42.)

She also testified he was not physically capable of performing his job functions as a lieutenant.

(*Id.*) Before and during the hearing, Cameron asked to speak with Lt. Leach, who obliged each

time. (*Id.* ¶ 41.) Cameron also testified. (*Id.* ¶ 43.) At the end of the hearing, Cameron handed

Lt. Leach a letter ordering him to appear in Cameron's office two days hence for a meeting

concerning Lt. Leach's employment status. (*Id.* ¶ 44; *see id.* Ex. C.) The letter stated that Lt.

Leach "ha[d] the right to have a union representative present during th[e] meeting, provided

there is no unreasonable delay in obtaining representation." (*Id.* Ex. C.) After receiving the

letter, Lt. Leach contacted PSOA representative Defendant Frank Labrada and told him that the

City wanted to negotiate a deal in light of the impending employment status hearing. (AC ¶ 46.)[1]

Plaintiffs allege that "[t]he caveat to the negotiation was that Lt. Leach [had to] participate

---

[1] The Amended Complaint is unclear and it is possible that Labrada gave Lt. Leach this information, not the other way around.

without legal representation in order for the City to make a favorable offer to him." (*Id.*) Labrada informed Lt. Leach that Ciaravino was "out to get him," that the City intended to bring at least fifteen felony charges against him, and that the City would put him in jail if he did not succumb to the City's terms. (*Id.* ¶¶ 46-47.) Labrada further advised that Ciaravino did not want Lt. Leach present during the negotiation meeting. (*Id.* ¶ 48.)

### 3. The Negotiation Meeting and the City's Offer

The negotiation meeting was held on August 14, 2015. (*Id.* ¶ 49.) Neither Lt. Leach nor Patrick Frawley, the attorney hired by the PSOA, was allowed to attend the meeting. (*Id.* ¶¶ 49, 51.) Instead, negotiations were made on Lt. Leach's behalf by two PSOA Representatives: Defendants Labrada and Richard Carrion. (*Id.* ¶ 49.) Also present at the meeting were Ciaravino; Cameron; Kelson; and four additional attorneys from the City's retained outside counsel, Lamb & Barnosky. (*Id.* ¶¶ 50, 58.)

Labrada and Carrion left the meeting after a short time and informed Lt. Leach that the City's outside counsel had extensive video of Lt. Leach performing physical labor for his tree removal business[2] and that there were fifteen felony charges pending against him for theft of city services based on fraud in connection with his § 207-c benefits. (*Id.* ¶¶ 53, 55, 58.) He was not given any information regarding the specific charges. (*Id.* ¶ 57.) Labrada and Carrion also informed Lt. Leach of the City's "non-negotiable" offer, (*id.* ¶ 60), which consisted of the following terms: if Lt. Leach immediately retired, forfeited approximately $84,000 in accumulated severance pay, and offered to reimburse the City for any § 207-c benefits he received, he would retire in good standing under § 207-c and avoid criminal charges, (*see id.* ¶¶ 54, 56, 63). Labrada and Carrion further advised that otherwise Lt. Leach would face the

---

[2] Plaintiffs assert that at some point Defendants "furnished the New York State Retirement system with [the] video surveillance footage . . . to prevent [Lt. Leach] from receiving accidental disability retirement." (AC ¶ 79.)

criminal charges, be terminated, lose his medical benefits and pension, and never be able to recover his benefits.  (*Id.* ¶ 60.)  Additionally, Labrada and Frawley told Lt. Leach that if he did not agree to the City's terms "the City would aggressively pursue criminal charges against him." (*Id.* ¶ 65.)

Lt. Leach rejected the terms, refused to sign early retirement documents, demanded to see the video evidence, and maintained his innocence with respect to the allegations of theft of city services.  (*Id.* ¶¶ 57, 59, 64.)  Nevertheless, a contract was drawn up by the City's attorneys within two hours.  (*Id.* ¶ 66.)  Labrada and Frawley told Lt. Leach that "he was 'staring down the barrel of a loaded shotgun' and that the only way to protect himself was to sign the agreement." (*Id.* ¶ 67.)

Plaintiffs allege that the written terms of the agreement "were vastly different than what was verbally conveyed to Lt. Leach."  (*Id.* ¶ 69.)  Specifically, the § 207-c benefits would cease immediately, his retirement in good standing would be left up to the decision of the acting chief, and the City "would take against his severance money in the amount of $72,000, which figure represents money received under [§ 207-c] by Lt. Leach plus the cost the City spent on the hiring of a private investigator to investigate Lt. Leach."  (*Id.*)  Even though the contract provided for a twenty-one-day review period, Labrada and Frawley told Lt. Leach that if he did not sign the contract within three days, the City would pursue the criminal charges against him for theft of services.  (*Id.* ¶¶ 71-72.)  Lt. Leach refused to sign the contract, hired a criminal defense attorney, and requested documentation supporting the $72,000 figure, which he did not receive. (*Id.* ¶¶ 70, 73-74.)

On August 18, 2015, Lt. Leach's wife forged his signature on the City's settlement agreement and delivered it to the City, allegedly "under extreme coercion and duress" and "[o]ut of fear for her husband's liberty." (*Id.* ¶ 77; *see id.* Ex. D.)

### 4. Post-Negotiation Events

At an unspecified time after Lt. Leach's alleged "forced retirement," Carrion and Labrada were both promoted to lieutenant, with Carrion assuming the position vacated by Lt. Leach. (AC ¶¶ 81-82.)

On September 4, 2015, Carrion and Labrada sent a letter to the CSC on behalf of the PSOA, asserting that Lt. Leach's sister-in-law, who was the sole administrator of the CSC, "pose[d] a serious conflict of interest that may jeopardize the integrity of [the CSC's] testing process" and "request[ing] a change of venue for the Police Lieutenants exam." (*Id.* ¶ 83.) Plaintiffs allege that Cameron and Ciaravino also contacted the CSC "in an effort to circumvent the requirements for Cameron to qualify for the Police Chief position." (*Id.* ¶ 85.) Cameron further sought the recusal of another member of the CSC on the ground that that member had assisted Mr. Leach in his tree business. (*Id.* ¶ 92; *see id.* Ex. G.)

After the CSC refused to change the qualification requirements for police chief, Ciaravino and Cameron initiated an Article 78 proceeding to ask the Supreme Court of Orange County to override the CSC's decision, the purpose of which, according to Plaintiffs, was to enable Cameron's appointment as police chief. (AC ¶ 86.) During the Article 78 hearing, there was testimony that "implicated Lt. Leach for theft of city services," which Plaintiffs believe was elicited to demonstrate the CSC's bias in light of the role of Lt. Leach's sister-in-law as administrator. (*Id.* ¶ 89.) The petition, which was brought three days before the CSC administered the open exam for the police chief position, was ultimately dismissed in its entirety.

(*Id.* ¶¶ 87, 90.)  Cameron never took the open exam, (*id.* ¶ 91), and on October 15, 2016, the CSC removed Cameron from the position of acting police chief, (*id.* ¶ 93; *see id.* ¶ 33).

Plaintiffs also assert that, prior to the City's investigation into Lt. Leach, the City never launched a private investigation against any officer for theft of services.  (*Id.* ¶ 80.)  At least one member of the City Council demanded an explanation from Ciaravino for the over $50,000 that was spent on the investigation of Lt. Leach without council approval, which Plaintiffs allege was another unprecedented action by the City.  (*Id.* ¶ 84; *see id.* Ex. F.)

Plaintiffs further allege that Lt. Leach's criminal defense attorney had several meetings with the Orange County District Attorney's Office on unspecified dates, during which Lt. Leach learned that Cameron and Ciaravino had "colluded in initiating an investigation" against him. (AC ¶ 76.)  The District Attorney eventually declined to prosecute and no charges were ever filed.  (*Id.* ¶ 78.)  On or about August 31, 2017, Lt. Leach paid $15,000 in attorney's fees in connection with his defense.  (*Id.* ¶ 75.)

## B.    Procedural History

On July 14, 2017, Plaintiffs commenced this action against the City, Cameron, Ciaravino, Labrada, and Carrion, asserting eighteen causes of action, including federal and state law claims styled as abuse of process, entrapment, constructive criminal prosecution, malicious prosecution, conspiracy, violation of Plaintiffs' freedom of association, and violations of "policies, practices and customs"; as well as state law claims for defamation, intentional infliction of emotional distress, rescission of contract, and indemnification.  (Doc. 1.)  On September 13, 2017, Defendants filed a letter requesting a pre-motion conference in anticipation of their motion to dismiss.  (Doc. 14.)  A pre-motion conference was held on October 18, 2017, during which I granted Plaintiffs leave to amend their complaint.  (Minute Entry dated Oct. 18, 2017.)

On January 9, 2018, Plaintiffs filed their amended complaint, asserting claims against Defendants pursuant to 42 U.S.C. § 1983 sounding in substantive due process, abuse of process, and malicious prosecution, as well as a state law claim for defamation. (Doc. 23.) Defendants filed the instant motion to dismiss on May 14, 2018. (Doc. 33.)

## II. DISCUSSION

### A. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to

relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

### B. Documents Properly Considered

When deciding a motion to dismiss, a court is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in
> it by reference, (2) documents "integral" to the complaint and relied upon in it,
> even if not attached or incorporated by reference, (3) documents or information
> contained in defendant's motion papers if plaintiff has knowledge or possession
> of the material and relied on it in framing the complaint . . . , and (5) facts of
> which judicial notice may properly be taken under Rule 201 of the Federal Rules
> of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation

marks omitted). To be incorporated by reference, the complaint must make "a clear, definite and

substantial reference to the documents." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60

(S.D.N.Y. 2010) (internal quotation marks omitted). "A document is integral to the complaint

where the complaint relies heavily upon its terms and effect. Merely mentioning a document in

the complaint will not satisfy this standard; indeed, even offering limited quotations from the

document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (alteration,

citation, and internal quotation marks omitted).

Plaintiffs attached seven exhibits to their Amended Complaint: (1) Dr. Harvey Seigel's

February 27, 2015 IME report regarding the extent of Lt. Leach's injuries, (AC Ex. A); (2)

Cameron's March 13, 2015 letter to Lt. Leach ordering him back to work, (*id.* Ex. B); (3)

Cameron's August 12, 2015 letter to Lt. Leach ordering him to appear for a meeting concerning

his employment status, (*id.* Ex. C); (4) a signed Letter of Resignation and Settlement Contract

between Lt. Leach and the City, (*id.* Ex. D); (5) the letter that Labrada and Carrion submitted on behalf of the PSOA to the CSC addressing a potential conflict of interest within the CSC, (*id.* Ex. E); (6) a Times-Herald Record article dated August 31, 2015, regarding the investigation of Lt. Leach, (*id.* Ex. F); and (7) a Times Community Newspapers of the Hudson Valley article dated August 30, 2016, concerning an interview of Cameron, (*id.* Ex. G). These documents, which are attached and incorporated by reference into Plaintiffs' Amended Complaint, are properly considered in deciding Defendants' motion to dismiss.

Defendants attached two exhibits to the declaration of their counsel, (Docs. 34, 39): (1) Plaintiffs' original complaint, (Doc. 34 Ex. A); and (2) Plaintiffs' Amended Complaint, (*id.* Ex. B). Both exhibits are part of the record of this case, so the Court may consider their contents.

Plaintiffs attached two additional exhibits to their supplemental opposition memorandum in support of their defamation claim, (Doc. 36 ("Ps' Supp. Opp.")): (1) Plaintiffs' letter to the City on October 24, 2015, (*id.* Ex. A); and (2) signed affidavits of City of Newburgh Councilwomen Cindy Holmes and Regina Angelo, and a signed letter from Councilman Cedric L. Brown, each certifying receipt of Plaintiffs' letter on or around October 24, 2015, and describing discussion of it by the City Council, Mayor, and City Manager, (*id.* Ex. B). Because these exhibits have no effect on this Opinion, the Court need not address whether they are properly considered in deciding the instant motion.

**C.       Substantive Due Process**

To plead a substantive due process claim, a plaintiff must allege facts establishing a cognizable liberty or property interest that was invaded in an arbitrary and irrational manner. *See O'Mara v. Town of Wappinger*, 485 F.3d 693, 700 (2d Cir. 2007); *Natale v. Town of Ridgefield*, 170 F.3d 258, 262-63 (2d Cir. 1999); *Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 546

(S.D.N.Y. 2014). Rights are protected by substantive due process only if they are "implicit in the concept of ordered liberty," and so "deeply rooted in this Nation's history and traditions" as to be ranked as fundamental. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotation marks omitted). Additionally, a plaintiff must plead governmental conduct that "'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)); *see Tessler v. Paterson*, No. 10-CV-9313, 2011 WL 1044208, at *6 & n.10 (S.D.N.Y. Mar. 11, 2011), *aff'd*, 451 F. App'x 30 (2d Cir. 2011) (summary order). Although "[t]he measure of what is conscience-shocking is no calibrated yard stick . . . , malicious and sadistic abuses of power by government officials, intended to oppress or to cause injury and designed for no legitimate government purpose, unquestionably shock the conscience." *Velez*, 401 F.3d at 94 (citation and internal quotation marks omitted).

Plaintiffs allege Lt. Leach was denied substantive due process when "Defendants subjected [him] to outrageous conduct in the course of depriving him of his liberty and property interests." (AC ¶ 96.) Discerning what facts Plaintiffs believe support this claim is difficult because they assert the substantive due process claim in a conclusory fashion without tying the claim to the facts recited. (*See id.*) In particular, Plaintiffs have not clearly identified a protected interest that was infringed, although it seems to be the loss of Lt. Leach's employment via his alleged forced retirement. The right to continued public employment, however, is not a cognizable interest that is accorded the protection of substantive due process. *See, e.g.*, *Guttilla v. City of N.Y.*, No. 14-CV-156, 2016 WL 1255737, at *3 (S.D.N.Y. Mar. 29, 2016) ("Interests related to employment are generally not protected under substantive due process because they do not implicate fundamental rights, such as the individual's freedom of choice with respect to

certain basic matters of procreation, marriage, and family life.") (alteration and internal quotation marks omitted); *Grasson v. Bd. of Educ.*, 24 F. Supp. 3d 136, 149 (D. Conn. 2014) (same); *Nichik v. N.Y.C. Transit Auth.*, No. 10-CV-5260, 2013 WL. 142372, at *12 (E.D.N.Y. Jan. 11, 2013) (collecting cases holding that public employment is not interest accorded substantive due process protection); *Tessler*, 2011 WL 1044208, at *6 (same); *see also Local 342, Long Island Pub. Serv. Emps., v. Town Bd.*, 31 F.3d 1191, 1196 (2d. Cir. 1994) ("[S]imple, state-law contractual rights, without more, are [not] worthy of substantive due process protection."); *Schultz v. Inc. Vill. of Bellport*, No. 08-CV-930, 2010 WL 3924751, at *7 (E.D.N.Y. Sept. 30, 2010) ("[B]ecause the Supreme Court has cautioned against expansion of the scope of substantive due process rights, courts are reluctant to convert employment related defamation claims into substantive due process claims.") (citation omitted).  Accordingly, to the extent Plaintiffs assert that Lt. Leach had a protected interest in his employment, they have not sufficiently pleaded a substantive due process claim.[3]

In their opposition, Plaintiffs contend that they have sufficiently pleaded a substantive due process claim because Defendants' conduct stigmatized Lt. Leach.  (*See* Doc. 38 ("Ps' Opp.") at 2-3.)  Even if the Amended Complaint plausibly pleaded that Lt. Leach experienced a loss of reputation (which is far from clear), this so-called "stigma-plus claim" would sound in procedural, rather than substantive, due process.  *See, e.g.*, *Segal v. City of N.Y.*, 459 F.3d 207, 212-13 (2d Cir. 2006) (action "invok[ing] the protections of the Due Process Clause where . . . employee has suffered a loss of reputation coupled with the deprivation of a more tangible

---

[3]  Further, the claim would fail even if Plaintiffs asserted a protected interest.  Even if Defendants were wrong in accusing Lt. Leach of fraud for working at his tree service company while seeking disability benefits, their actions would not be so outrageous or offensive to human dignity to shock the conscience and amount to a substantive due process violation.  *See Volunteer Fire Ass'n of Tappan, Inc. v. County of Rockland*, No. 09-CV-4622, 2010 WL 4968247, at *8 (S.D.N.Y. Nov. 24, 2010).  Likewise, Plaintiffs have not provided facts plausibly suggesting that Defendants' actions were not "correctable in . . . state court," and thus a substantive due process claim is not stated.  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 505 (2d Cir. 2001).

interest, such as government employment[,] . . . is referred to as a stigma-plus claim," which is

"a species within the phylum of procedural due process claims") (citation and internal quotation

marks omitted); *see Griffen v. City of N.Y.*, 880 F. Supp. 2d 384, 404 (E.D.N.Y. 2012) (same);

*see also Cohance v. NCAA*, No. 04-CV-181, 2013 WL 8171044, at *56 (W.D.N.Y. Aug. 8,

2013) (allegations that defendants deprived plaintiff of "his substantive due process liberty

interest in his good name, reputation, and continued employment as an NCAA head basketball

coach by proffering and submitting false testimony during . . . investigations . . . sound[ed] in

procedural, rather tha[n] substantive, due process") (citations and internal quotation marks

omitted), *report & recommendation adopted as modified by* 2014 WL 1279151 (W.D.N.Y. Mar.

27, 2014), *aff'd*, 612 F. App'x 41 (2d Cir. 2015) (summary order).

Plaintiffs' stigma argument does not prevent dismissal for three reasons.  First, Plaintiffs'

Amended Complaint does not assert a procedural due process claim and Plaintiffs cannot amend

a pleading through their opposition to a motion to dismiss.  *See Shah v. Helen Hayes Hosp.*, 252

F. App'x 364, 366 (2d Cir. 2007) ("A party may not use his or her opposition to a dispositive

motion as a means to amend the complaint.") (summary order); *Grandy v. Manhattan & Bronx

Surface Transit Operating Auth.*, No. 16-CV-6278, 2018 WL 4625768, at *11 (S.D.N.Y. Sept.

26, 2018) (same) (collecting cases).[4]  Second, "where a specific constitutional provision

prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983

suit cannot make reference to the broad notion of substantive due process."  *Velez*, 401 F.3d at

94; *see County of Sacramento*, 523 U.S. at 842 (noting that the Supreme Court has "always been

reluctant to expand the concept of substantive due process" and that "where a particular

Amendment provides an explicit textual source of constitutional protection against a particular

_____

[4]  For the same reasons, to the extent Plaintiffs attempt to assert a conspiracy claim in their opposition brief, (*see*
Opp. at 1, 3), it will not be considered.

sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims") (alteration and internal quotation marks omitted). Because what is alleged to be so shocking about Defendants' conduct is the alleged deprivation of Lt. Leach's property or liberty interest without procedural due process, his substantive due process claim must fail. *See Chapman v. Ouellette*, 200 F. Supp. 3d 303, 310 (D. Conn. 2016); *see also Piccoli v. Yonkers Bd. of Educ.*, No. 08-CV-8344, 2009 WL 4794130, at *6 & n.5 (S.D.N.Y. Dec. 11, 2009) (substantive due process claim may be inappropriate where it is duplicative of "stigma-plus" procedural due process clam and where particular Amendment provides explicit source of constitutional protection).[5] Third, even if a procedural due process stigma-plus claim were asserted, it would fail because Plaintiffs do not allege that Defendants made stigmatizing statements about Lt. Leach publicly at the time he was terminated. *See Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) (stigma-plus claim requires false statement made public concurrently in time with plaintiff's dismissal).[6]

Accordingly, Plaintiffs' substantive due process claim is dismissed.

### D.  Abandonment

Defendants also move to dismiss Plaintiffs' claims for abuse of process and malicious prosecution on the grounds that Plaintiffs have not identified any legal process that was abused and have conceded that Lt. Leach was never the subject of a criminal prosecution. (Mem. at 10-12.) Plaintiffs do not refute or even discuss Defendants' arguments. A federal court may deem a

---

[5] *Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002) (*en banc*), an out-of-Circuit decision upon which Plaintiffs rely, (*see* Opp. at 2), does not compel a different result. In addition to being non-binding, *Moran* conflicts with Second Circuit precedent that clearly states that an action invoking the protections of the Due Process Clause to redress a loss of reputation coupled with the deprivation of government employment implicates procedural due process, *Segal*, 459 F.3d at 212-13, and that a claim sounding in substantive due process must be dismissed where procedural due process protections provide an avenue for redress, *Velez*, 401 F.3d at 94.

[6] Further, it appears that by Plaintiffs' account, Lt. Leach did not get a hearing because his wife signed a document waiving that hearing, not because of any action by Defendants. (*See* AC ¶ 77; *id.* Ex. D ¶ 7.)

claim abandoned when a party moves to dismiss it and the opposing party fails to address the argument in any way. *Div. 1181 Amalgamated Transit Union v. R&C Transit, Inc.*, No. 16-CV-2481, 2018 WL 794572, at *4 (E.D.N.Y. Feb. 7, 2018) (collecting cases); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014). Because Plaintiffs did not address Defendants' arguments for dismissal of the second and third causes of action, the Court "properly infer[s] that [P]laintiffs, represented by counsel, have abandoned them," *Louis v. N.Y.C. Hous. Auth.*, 152 F. Supp. 3d 143, 156 (S.D.N.Y. 2016), and they are dismissed.

Additionally, Defendants contend that Plaintiff Dominica Leach has not stated a cause of action, because the only factual allegation concerning her is that she forged her husband's signature on a settlement agreement and delivered it to the City. (Mem. at 7.) Plaintiffs again do not refute Defendants' contention, nor do they specifically address how Defendants violated the rights of Dominica Leach. Accordingly, to the extent Plaintiff Dominica Leach asserts any federal claims against Defendants, they are dismissed as abandoned. *See Louis*, 152 F. Supp. 3d at 156.

### E. State Law Claims

In addition to their § 1983 claims, Plaintiffs further assert a state law claim for defamation. The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that the claims over which this Court has original jurisdiction should be dismissed, I decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law defamation claim. *See id.*

(citing 28 U.S.C. § 1367(c)(3)).  Accordingly, Plaintiffs' fourth cause of action for defamation is dismissed without prejudice.

## III.  <u>LEAVE TO AMEND</u>

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "It is within the sound discretion of the district court to grant or deny leave to amend."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "Leave to amend, though liberally granted, may properly be denied for:  'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'"  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have already amended once, (Doc. 23), after having the benefit of a pre-motion letter from Defendants outlining their proposed grounds for dismissal, (Doc. 14), and the Court's observations at the October 18, 2017 pre-motion conference.  Plaintiffs have not asked to amend again or otherwise suggested they are in possession of facts that would cure the deficiencies identified in this opinion.  "The problem with [their] causes of action is substantive; better pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  Accordingly, the Court declines to grant leave to amend *sua sponte*.  *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d

160, 190 (2d Cir. 2015) (denial of leave to amend would be proper where "request gives no clue as to how the complaint's defects would be cured") (internal quotation marks omitted).

**IV.**    **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED.  Plaintiffs' first, second, and third causes of action are dismissed with prejudice, and Plaintiff's fourth cause of action is dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 33), and close the case.

**SO ORDERED.**

Dated:  December 4, 2018
          White Plains, New York

_____
UNITED STATES DISTRICT JUDGE